Filed 7/29/25  Dalo v. Hay CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| RANDY DALO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BRADLEY HAY et al., <br><br> Defendants and Respondents. | D082559 <br><br><br> (Super. Ct. No. 37-2018-00017017-CU-MM-CTL) |


APPEAL from a judgment and order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Iredale & Yoo, Eugene G. Iredale, Julia Yoo, Grace Jun; Williams Iagmin and Jon R. Williams, for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Hegeler & Anderson, Barton H. Hegeler, Storm P. Anderson, Wyatt D. Hegeler; David Weiss Law, David J. Weiss, Daniel V. Farrugia, and Nicholas A. Weiss, for Defendants and Respondents.

A jury found that defendants Bradley Hay and The Regents of the University of California (the Regents) were not liable to plaintiffs Randy and Karen Dalo (together, the Dalos) for claims arising from a surgery performed

on Randy. After the trial court entered judgment in accordance with the jury's special verdict, the Dalos moved for judgment notwithstanding the verdict (JNOV) and a new trial. The court denied both motions.

The Dalos argue on appeal that the court committed legal error in denying their post-trial motions for JNOV and new trial on sufficiency of evidence grounds. The Dalos also argue that a new trial is warranted because the jury's verdicts are inconsistent. We conclude that the trial court correctly decided there is substantial evidence to support the jury's verdict and the special verdict findings are not irreconcilable. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize the relevant facts in the light most favorable to the judgment. (See *DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.)

*A. The Surgery*

In 2013, Randy stopped working as a sportfishing boat captain and started receiving disability benefits because he suffered from chronic obstructive pulmonary disease and nerve damage. He was diagnosed with depression in 2011 and again in January 2017, in part because he could no longer work and had chronic back pain. To treat his pain, Randy underwent cervical spine surgery in January 2017 with Dr. Todd Allen, an orthopedic surgeon at the University of California San Diego (UCSD), where his wife Karen also worked as an assistant to the surgical staff. Hay, who was an anesthesiologist at the time, obtained Randy's consent to receive anesthesia. Hay and Tammy Nodler, a Certified Registered Nurse Anesthetist, administered the sedatives, paralytics, and opioid analgesics during Randy's surgery.

2

Hay had a long history of substance abuse and decided to divert fentanyl and sufentanil from Randy's surgery for his personal use. He planned to falsify Randy's medical records to conceal his diversion, and to dispose of saline instead of the actual excess substances to avoid detection. After inducing Randy's anesthesia, Hay went to a nearby bathroom to inject himself with stolen fentanyl while Nodler remained in the operating room to monitor Randy's anesthesia. After the surgery ended, Hay also injected himself with sufentanil he took from the operating room and overdosed in the hospital bathroom.

Unbeknownst to the Dalos, the Drug Enforcement Agency (DEA) and UCSD initiated investigations into Hay's conduct. Shortly after the procedure, Randy told Karen he thought he might have woken up during surgery.

A few weeks after the surgery, Nodler told Karen that Hay had a "breakdown" after Randy's surgery and that "drugs were missing." In March 2017, Dr. Gerard Manecke, UCSD's chief anesthesiologist, scheduled a conference call with the Dalos. Dr. Manecke asked how Randy was doing during the call, but he said he could not comment on what Nodler had told Karen. Over the next several weeks the Dalos were told that investigations were underway, but they were not privy to the specific details of Hay's conduct until November 2017 when Karen saw an internet article about the state medical board suspending Hay's license.

*B. The Complaint*

The Dalos sued Hay, Nodler, Dr. Allen, Dr. Manecke, and the Regents in 2018 for medical negligence, battery, breach of fiduciary duty, fraud by

3

misrepresentation, and fraud by concealment.[1]  In support of their medical negligence claim, the Dalos alleged that Hay under-anesthetized Randy, falsified his medical records, and violated professional codes of conduct.  For their battery cause of action, the Dalos claimed that Hay failed to obtain Randy's informed consent to anesthesia because he did not disclose his plans to divert and abuse controlled substances, falsify records, and administer insufficient anesthesia.  The Dalos' breach of fiduciary duty and fraud claims were based on allegations that defendants failed to inform the Dalos about Hay's misconduct, and that Hay was dishonest when obtaining Randy's consent to anesthesia, he falsified records, and he failed to properly administer anesthesia.

As for harm, the Dalos alleged that Randy suffered extreme emotional distress in the form of depression, anxiety, pain and suffering, loss of consortium, and economic loss relating to past and future medical expenses. They also alleged that Karen suffered "loss of consortium, services and society."

### C. Plaintiffs' Witnesses

#### 1. The Dalos

Randy testified that when he was waking up after the surgery ended, a surgical resident asked him to squeeze his hand or fingers.  He described being in "tremendous pain" immediately after the surgery until the pain medications started, which happened "pretty quick."  He was able to go home early to recover, and he said the surgery itself was "great."  The night after the surgery, however, Randy had a nightmare about waking up and seeing silhouettes around him.  In the dream he tried to scream, but could not move

---

[1]     Defendants Dr. Allen, Nodler, and Dr. Manecke were ultimately dismissed from the case, so we do not summarize the specific allegations against them here.

or make a sound. He recalled having a similar experience during a surgery in 1996, when he was waking up in a recovery room but could not talk because he was still intubated. Randy had been taking opioid medications daily for his back pain since around 2013.

Karen testified about her employment at UCSD and Randy's extensive treatment history there. When she went to see Randy in the recovery room after his surgery, she said he "appeared to be in a lot of pain" until he received pain medication shortly thereafter. When Randy first told her about his dreams of waking up during surgery, she dismissed the possibility. Karen said Randy became paranoid and fixated on what happened during the surgery after he learned that Hay had a "breakdown." This had a negative impact on their marriage, and by May 2017, Karen and Randy were barely speaking to each other because Randy was "obsessed with what happened to him[.]" When she learned about Hay's diversion in November 2017, Karen felt angry, but also guilty for not believing Randy.

## 2. Adverse Witnesses Called by the Dalos

The Dalos called Hay as an adverse witness. Hay testified about his history of substance abuse and admitted to stealing fentanyl and sufentanil during Randy's surgery. He discussed being diagnosed with opioid abuse disorder and bipolar disorder while receiving addiction treatment. He also admitted to all of the state medical board's accusations against him and conceded that he had broken the law, acted unethically, falsified records, and put patients at risk. Hay maintained, however, that he and Nodler administered anesthesia to Randy safely and effectively, and that Randy was not injured in the process. Hay testified that he could "compartmentalize and do safe anesthesia," even though he was "a degenerate" and "the rest of [his] life was a mess."

Dr. Manecke also testified during the Dalos' case as an adverse witness. He addressed his responsibilities at UCSD, the hospital's policies and procedures, his experiences supervising and working with Hay, and his post-surgery conversations with the Dalos. After explaining the various ways Randy's vital signs were monitored and recorded during the surgery, Dr. Manecke said he believed the anesthesia was adequate and that Randy could not have been awake during the surgery. Basing his opinion in part on the doses of medication Randy received at the surgery's outset, Dr. Manecke said Randy had "a generous safe induction of anesthesia" and there was no chance he would have been aware after that point. He explained that even when deeply sedated, a patient can sometimes move or cough when being intubated—especially if they are smokers, as Randy was. Dr. Manecke also said that according to post-anesthesia care unit (PACU) records, Randy reported a pain score of "zero" immediately after surgery. Dr. Manecke concluded there was no medical error that caused harm to Randy.

6

Nodler testified about her role in administering anesthesia for Randy's surgery. Nodler could not recall whether she or Hay injected the medications at induction. Shortly after induction, Nodler noticed that the sufentanil had not been started. Hay was no longer in the operating room at that point, so she texted him to let him know that she turned it on and that the dosage should be increased to account for Randy's weight. When Hay came back to the operating room, he told Nodler that they should alter the recorded amount of sufentanil administered because the unit of measurement was incorrect. Hay changed the chart entry himself, which concerned Nodler. She then observed him emptying syringes that were supposed to contain leftover controlled substances into a disposal container. Nodler said she did not know the syringes only contained saline.

She explained that during Randy's surgery, she was in constant communication with the neuromonitoring technologist about the depth of Randy's anesthesia. Randy "bucked" at one point during the surgery when Dr. Allen and a surgery fellow moved his trachea and esophagus, but Randy's neuromonitoring indicated he was completely asleep at the time. Nodler said it is not uncommon for patients to cough at that point in the procedure, and that the movement did not impact the surgery. She also believed that the anesthesia for Randy's surgery went "very well."

### 3. Expert Witnesses

The Dalos' expert witnesses included Cheryl James, Randy's therapist. James testified that when she began treating him in 2019, Randy was distressed over a recurring memory of being partially awake during his surgery. She observed that discovering he may have actually been awake during the surgery was "even more upsetting for him" and made him afraid to seek additional medical attention. James diagnosed Randy with major

depressive disorder (MDD) because of the hopelessness he felt about being unable to return to fishing, his feelings of shame from burdening his family, and the social isolation caused by his disabilities. She noted that his recurrent surgery nightmares made him afraid of dark spaces. James also diagnosed Randy with post-traumatic stress disorder (PTSD) because he was repeatedly exposed to details about the surgery in litigating his suit, had recurring nightmares about the procedure, reported being triggered each time he had to see a doctor for his health issues, and felt shame from being unable to return to work.

On cross examination, James confirmed that despite his fears, Randy was nonetheless able to undergo surgery with Dr. Allen again in April 2021. James also said she did not know when Randy was first diagnosed with depression, and that his depression could have started before 2019.

Dr. Christine Baser, a psychologist who evaluated Randy in late 2018, opined that he suffered from mental disorders because of the surgery and post-surgical events. Specifically, she concluded that he had a neurocognitive disorder, MDD, general anxiety disorder, and PTSD. In making those diagnoses, Dr. Baser relied in part on a clinical interview, psychological tests, Randy's medical history, and deposition testimony from his primary care physician, Dr. Fiorella. Dr. Baser said Randy had "a brief episode" of depression in 2011, but that he was not treated for depression again after that year. She observed that his nightmares, reluctance to see other doctors, anxiety, and feelings of betrayal "snowballed" after the surgery.

On cross examination, Dr. Baser initially said that aside from a brief period in 2011, Randy "had stressors and health problems" but did not have clinical depression before the 2017 surgery. When defense counsel pointed out Dr. Fiorella's deposition testimony that Randy had been diagnosed with

8

depression in 2011 "and continuing," Dr. Baser admitted she had missed that in her review. She then conceded that although her declaration said that Randy had "[MDD], single episode, mild," given Dr. Fiorella's testimony, her declaration should have said Randy has "recurrent" MDD. Dr. Baser confirmed that Randy's chronic pain and medications could cause depression. She also acknowledged evidence showing that Randy expressed the desire to have another surgery during a post-operative visit with Dr. Allen in February 2018.

Dr. Don Mills, an anesthesiologist and medical board examiner, testified that he did not believe Randy was sufficiently anesthetized to rule out intraoperative awareness. Dr. Mills cited the fact that Randy bucked during the procedure and had, in his opinion, an unusually quick awake time upon arrival to the recovery room. He also relied on the fact that Randy testified he was in excruciating pain when he first awoke from surgery, even though medical records indicated otherwise. Dr. Mills said that none of the medical records could be trusted because of "all of the mistakes and falsifications" and because he believed Hay could have altered the records after the surgery.

On cross-examination, Dr. Mills acknowledged that he did not have expertise in neuromonitoring, had no opinion on how such monitoring was done during the surgery, and did not initially recall reviewing the neuromonitoring report. He also conceded that at several points in the two hours immediately following surgery, the PACU nurse noted that Randy's pain scores were "zero" before he received his first dose of pain medication. When asked about Randy's memory of being instructed to squeeze someone's hand, Dr. Mills explained that it would have occurred during a "neurologic exam" after the surgery.

9

Lastly, the Dalos called DEA Agent John Woo as a rebuttal witness during the defense's case to testify about the warrant affidavit he drafted in his investigation of Hay's diversion.

*D. Defense Witnesses*

The defense called Dr. Raffi Simonian, UCSD's Director of Pharmacy at the time of Randy's surgery, and Dr. Chih Hsu, a pharmacist who worked with Simonian. Simonian and Hsu testified about the investigation into Hay and about UCSD's policies to minimize the diversion of narcotics in anesthesia. Another pharmacist, Anthony Morreale, testified that in his expert opinion, UCSD's policies and practices regarding controlled substances complied with applicable standards of care.

Dr. Clark Smith, an addiction psychiatrist, treats high-functioning fentanyl addicts, including anesthesiologists. Dr. Smith met with Hay and reviewed his deposition testimony, trial testimony, and records from various addiction treatment facilities, among other documents. He concluded that Hay was a high-functioning addict in that he "was able to function at a very high level while using [opiates], and according to his job performance, was able to continue to perform well." In reaching that conclusion, Dr. Smith considered the fact that numerous surgeons, nurses, and other hospital staff closely observed Hay's performance daily and did not notice his addiction. Dr. Smith also observed that Hay was "very honest" in talking about his addiction, and that there was no attempt to cover up or minimize his bad decision-making.

Dr. Ellen Stein, a forensic psychologist, also testified for the defense. After reviewing the battery of psychological tests administered to Randy by the Dalos' experts, Dr. Stein opined that the test results were inconsistent with some of their diagnoses. For example, although Dr. Baser diagnosed

10

Randy with PTSD, a 2018 psychological test administered by Dr. Baser did not indicate Randy had PTSD, nor did the results show he was especially fearful. The computer-generated narratives from those results stated that Randy "may manipulate others through his physical symptoms" and "may become hostile if sufficient attention is not paid to his complaints." The only diagnosis generated by that test was somatoform disorder.

Dr. Stein noted that another test Dr. Baser administered in 2018 and 2019 showed neither PTSD nor somatization. She also observed that Dr. Baser did not discuss these or other test results in her report. Dr. Stein concluded that there was no objective data to support Dr. Baser's opinion that Randy had PTSD, and that it would be inconsistent for someone with PTSD and Randy's reported fears to seek out surgery in 2018. She also opined that Randy's longstanding health conditions preceding the surgery, and the medications he was taking to treat those conditions, could have been the cause of his mood swings, anxiety, depression, and personality changes.

Dr. Jeffrey Gertsch, the UCSD surgical neurophysiologist who conducted Randy's neuromonitoring during the surgery, explained that with the assistance of a technologist in the operating room, he monitored electrical activity in Randy's brain in real time using electrodes placed on Randy's body. He testified that the neuromonitoring records from the surgery showed that Randy was very deeply anesthetized throughout.

Dr. Richard Jaffe, a neuroanesthesia professor at another university who reviewed Randy's neuromonitoring records, agreed with Dr. Gertsch's conclusion and was "impressed by the depth of anesthesia" Randy experienced during the case. Dr. Jaffe observed that Randy was under "unusually deep anesthetic," and that the electroencephalography (EEG) data was "remarkably persuasive" in showing it was essentially impossible for

Randy to have been conscious or to have formed memories during his surgery. Dr. Jaffe further opined that Randy's memory of waking up was consistent with transitional awareness while emerging from anesthesia after the surgery. He explained that especially after a cervical spine procedure, it is not unusual to ask a patient to squeeze someone's fingers so that providers can confirm "that all of the control pathways" from a patient's brain "to his arms and hands are working."

Dr. Brian Clay, UCSD's Chief Medical Information Officer, testified that he found no evidence of manipulation or changes in Randy's recorded vital signs during surgery, and that his vital sign information was reliable.

Dr. Gregory Hammer, another anesthesiologist, testified that the anesthetic plan for Randy was "very similar, if not the same," as one that he would have made. Similar to Dr. Manecke's testimony, Dr. Hammer explained that Randy may have coughed or bucked during surgery, even when deeply anesthetized, because his trachea was irritated from smoking. He was confident that Randy was not aware during surgery and that Randy's memory of being asked to squeeze someone's fingers was consistent with his providers watching for signs of wakefulness during post-operative awareness. He emphasized that Randy would not have been able to open his eyes during the surgery because his eyes would have been taped closed with a drape covering his face. Dr. Hammer also said that Randy's memory of waking up from the 1997 surgery and being unable to talk was consistent with emerging from anesthesia at the end of a procedure.

Dr. Hammer disagreed with Dr. Mills's assessment that Randy had an unusually fast waking time. Dr. Hammer explained that according to the anesthesia record, Randy actually spent the first one to two hours of his post-surgery recovery in the operating room before being moved to the recovery

room, where he woke up soon after. Dr. Hammer opined that when taking into account the operating room recovery, Randy did not wake up quickly. He concluded that Hay's diversion did not affect Randy's anesthesia because the administered medications, neuromonitoring data, and vital sign information all showed Randy was deeply and sufficiently anesthetized during the entire surgery.

Dr. Lawrence Shuer, a neurosurgeon, testified about the purpose of "well-being committees" in hospitals. Dr. Shuer explained how and why the committees attempt to help rehabilitate physicians like Hay who struggle with substance abuse.

*E. Closing Arguments*

Before closing arguments, the trial court directed the following verdicts in the Dalos' favor: (1) that Hay was negligent in treating Randy (count 1, negligence); (2) that Hay obtained Randy's consent to anesthesia by intentional concealment of material facts (count 2, battery); (3) that Hay failed to act in good faith in Randy's best interests (count 3, breach of fiduciary duty); and (4) that Hay intentionally failed to disclose a nonprivileged material fact to Randy, and in doing so, he intended to deceive Randy (count 4, fraud by concealment). Accordingly, the court gave the jury a verdict form with these questions already pre-answered.

The Dalos' counsel argued in closing that Randy was harmed by Hay's unconsented-to administration of anesthesia and that "all damages flow" from the battery cause of action. He contended that the Dalos were entitled to noneconomic damages in the amount of $10 million for their "mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress." This harm, counsel argued, stemmed from Randy's nightmares, his traumatic memories of being awake during surgery,

13

discovering he was treated by a physician who stole drugs, and feeling betrayed by UCSD.

Defense counsel argued there was no dispute Hay violated standards of care and that he betrayed the Dalos. The defense contended that the evidence, however, still showed that Randy did not have an episode of intraoperative awareness and was sufficiently anesthetized during surgery. Counsel argued that Randy's memory of waking up was consistent with normal emergence from anesthesia, and to the extent he had nightmares about it, those nightmares were not caused by the defendants' negligence, fraud, or malpractice. They asserted that Randy's struggles with disability, worsening health conditions, chronic pain, and medication side effects all contributed to his depression. According to the defense, Hay's misconduct in diverting drugs, falsifying records, and concealing his addiction did not cause Randy any harm.

The Dalos' attorney argued in rebuttal that the Dalos suffered harm beyond intraoperative awareness, including the mental distress of learning about Hay's misconduct after the fact, the breach of trust that caused, and harm from the "attempted coverup."

*F. Jury Verdict and Judgment*

After deliberating for a day, the jury found that Hay's negligence in treating Randy was not a substantial factor in causing Randy harm. As for battery, the jury found that Randy was not harmed by Hay's intentional concealment of facts in obtaining Randy's consent to the anesthesia. On the breach of fiduciary duty claim, the jury found that Hay's failure to act in good faith did harm Randy, but that the failure was not a substantial factor in causing Randy harm. For fraud by concealment, the jury decided that Randy reasonably would have behaved differently if Hay had disclosed "a

14

nonprivileged material fact" that he intentionally concealed. But the jury also determined that Hay's concealment of that fact was not a substantial factor in causing Randy harm. The jury found in UCSD's favor on all of the Dalos' claims and awarded them no damages. The court entered judgment on the jury's verdict in favor of Hay and UCSD.

*G. Motions for JNOV and New Trial*

The Dalos moved for JNOV under Code of Civil Procedure section 629 on: (1) the issue of harm and causation for their battery, breach of fiduciary duty, and fraudulent concealment claims against Hay, and (2) their fraudulent concealment claim against UCSD. The Dalos argued they were entitled to damages as a matter of law because the physical administration of anesthesia to Randy was done without legitimate consent. They also contended Randy suffered emotional distress from learning about Hay's misconduct and from UCSD's failure to notify Randy that he was a victim of a crime under Health and Safety Code section 1279.1.[2]

The Dalos also moved for a new trial under Code of Civil Procedure section 657 on all their causes of action against Hay as to causation and damages, and on their fraudulent concealment claim against UCSD. Citing many of the same reasons given in their JNOV motion, the Dalos argued, in relevant part, that: (1) the jury's verdict was not supported by the evidence; (2) the jury gave conflicting responses on the special verdict form; (3) the trial court should have given the Dalos' proposed jury instructions; and (4) the Dalos did not get a fair trial.

---

[2] Health and Safety Code section 1279.1 provides, in relevant part, that licensed health facilities must report specified "adverse events" to the state within a certain time period. The Dalos have made no reference to this statute on appeal so we do not address it here.

15

In separate oppositions to both motions, defendants argued that just because the consent was faulty did not mean Randy was necessarily harmed. They also argued substantial evidence supports the jury's finding that defendants' conduct was not a substantial factor in causing the Dalos harm. They pointed to evidence showing that Randy received sufficient anesthetic and that his nightmares were the result of emergence awareness. Defendants also highlighted evidence that the Dalos were notified of the significant facts a few weeks after surgery, Dr. Manecke offered to answer their questions while UCSD's investigation was pending, Randy was still able to undergo surgery with Dr. Allen in February 2018, and Randy had struggled with depression for years before the surgery due to his inability to work, myriad health problems, and medication side effects. Finally, defendants argued that the verdicts were not inconsistent because the jury could logically find that Randy was unharmed from the surgery itself, but the Dalos still suffered emotional distress upon finding out what happened.

The same trial court judge who presided over the trial denied the Dalos' motions in a written ruling, finding that the jury's verdict was supported by substantial evidence. The court first incorporated by reference and adopted the arguments and supporting evidence set forth in the defense's opposition papers and oral arguments. The court then highlighted "some additional points and observations" in support of its decision to deny the motions. The court noted that given the evidence presented at trial, a jury could reasonably question Randy's credibility regarding his claims of being in severe pain after surgery, his alleged intraoperative awakening, his testimony about his nightmares, and the state of the Dalos' marriage before the surgery.

The court also observed that although Randy may have developed PTSD and other mental health challenges after the surgery, there was

16

substantial evidence that those issues arose from his experience of "benign transitional awareness" while emerging from anesthesia, for which Hay and UCSD bore no legal fault. While acknowledging that Randy experienced upset, anger, and anxiety upon learning of Hay's misconduct, the court found that "such does not give rise to compensable emotional distress damages" where "the breaches, themselves, caused no harm." The court further found, among other things, that the jury's findings were not fatally inconsistent.

DISCUSSION

I

When reviewing an order on a motion for JNOV, we "use the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)  We resolve conflicts in the evidence against the Dalos and draw all reasonable inferences in favor of defendants.  (See *Fountain Valley Chateau Blanc Homeowner's Ass'n v. Dep't Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.)  We must affirm the denial of JNOV if there is any substantial evidence, contradicted or uncontradicted, supporting the verdict.  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)  "Substantial evidence" is evidence that is reasonable, credible and of solid value, rather than speculative or conjectural.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651–652.)  When the issue presented on appeal from an order denying JNOV deals solely with a legal question in the context of undisputed facts, review of the court's decision is de novo.  (*Ibid.*)  We review the trial court's ruling on the Dalos' motion for a new trial for abuse of discretion.  (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

On appeal, the Dalos take issue with the way the trial court framed its analysis of emotional distress damages, claiming that the court was "fixated" on the fact that Hay's provision of anesthesia caused Randy no harm.[3]  Specifically, they contend the court erroneously concluded Randy could not

---

[3]    In their briefing of this issue on appeal, the Dalos contend that the trial court erred in denying their "post-trial motions" without differentiating between the JNOV and new trial motions.  We therefore analyze the rulings together in this opinion.

recover emotional distress damages "from subsequently learning of []
breaches where the breaches, themselves, caused no harm." The Dalos assert
the court's erroneous rationale "improperly infected" and "permeated" its
post-trial motion rulings. But in their own narrow focus on this portion of the
decision, the Dalos disregard the rest of the court's multi-page analysis
explaining that it denied their motions for JNOV and a new trial because
"[t]he jury's verdict was fully supported by substantial evidence and no
miscarriage of justice occurred." The Dalos also overlook that "we are not
bound by the trial court's reasons" and will affirm the court's orders "if
correct upon any theory of applicable law." (*Cal. Serv. Station Etc. Ass'n v.
Am. Home Assur. Co.* (1998) 62 Cal.App.4th 1166, 1171.)

We conclude that regardless of whether the court's statements about
emotional distress damages were erroneous, we must affirm because the
court correctly found that "[t]he jury's verdict was fully supported by
substantial evidence and no miscarriage of justice occurred." Not only did the
court incorporate by reference and adopt the defense's arguments, it
explained how the jury could have reasonably questioned the Dalos'
credibility and also concluded that "[t]here was substantial evidence adduced
at trial that [Randy's] post-surgical mental health problems arose out of his
*mistaken* belief of having suffered an episode of malignant intraoperative
awareness, when, in fact, all he had experienced was an episode of benign
transitional awareness, not the fault of [] Hay."

The Dalos do not meaningfully engage these findings or explain why
they are incorrect. But even if they had, their efforts would be unavailing.
First, we disagree with the Dalos' argument that the jury was required to
find that failing to obtain informed consent "on its own" constitutes battery
as a matter of law, and that the necessary element of harm "was complete

19

once Hay performed *any* anesthesia services on Dalo without his consent[.]"
In this case, it was the jury's province to decide whether Randy suffered
harm as an element of battery separate and apart from whether Hay
performed a procedure without his consent. (CACI No. 530A (medical
battery) [listing harm to plaintiff as a separate element from lack of consent
and causation]; see *So v. Shin* (2013) 212 Cal.App.4th 652, 669 [same].) The
court instructed the jury on lack of consent and resulting harm as separate
elements of battery, and no instruction told the jury it had to find harm
merely from the performance of anesthesia without Dalo's informed consent.
Nor did plaintiff's counsel argue to the jury that the anesthesia procedure
itself satisfied the harm element as a matter of law. Absent any claim of
instructional error, we must evaluate the sufficiency of evidence under the
instructions given. (*Bullock v. Philip Morris USA, Inc.* (2008) 159
Cal.App.4th 655, 674–675.) We therefore consider whether substantial
evidence supports the jury's finding that the unconsented-to anesthesia did
not itself harm Randy.

We conclude that it does. Randy obviously wanted anesthesia for the
surgery. Defense witnesses testified that Hay was a high-functioning addict
who performed his job well, and that data from Randy's surgery showed he
was deeply anesthetized. Expert witnesses explained why they believed
Randy did not experience any intraoperative awareness and why he could not
have formed any memories during surgery. To the extent Randy had a
memory of being awake and being told to squeeze someone's hand, multiple
experts testified that Randy's memory is consistent with routine transitional
awareness when emerging from anesthesia.

Expert witnesses also explained at length why the anesthesia Hay and
Nodler administered to Randy was consistent with accepted practices.

20

Dr. Mills testified that he believed Randy was insufficiently anesthetized because he bucked during the procedure and "woke up immediately after the surgery was over." But not only was the jury generally entitled to reject Dr. Mills's testimony even if uncontradicted (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890), the defense presented evidence showing that Randy took longer to awaken after surgery than Dr. Mills asserted, and that bucking is not inconsistent with deep anesthesia.

Moreover, although Randy said he was in pain immediately after the surgery, the jury heard evidence that he reported no pain for the first couple of hours in the PACU. The Dalos also confirmed that Randy received pain medication shortly after he recalled feeling pain, and that it helped alleviate the pain quickly. Randy even testified that the surgery itself was "a great one." The jury's finding that Randy suffered no harm from the unconsented-to anesthesia is therefore supported by substantial evidence.

Substantial evidence also supports the jury's findings on the Dalos' breach of fiduciary duty and fraudulent concealment claims. The jury concluded that while Hay's failure to act in good faith harmed Randy, his failure was not a substantial factor in causing Randy harm. The jury also concluded—without making a separate finding as to whether Randy was harmed—that Hay's intentional concealment of a material fact was not a substantial factor in causing Randy harm. The jury could have reasonably reached these conclusions in at least a few different ways. First, as noted, the jury heard evidence indicating that Randy did not experience intraoperative awareness, but rather had a memory of transitional awareness. The court correctly observed that in this scenario, the jury could have concluded Randy suffered harm in the form of emotional distress, but the harm "arose out of his *mistaken* belief of having suffered an episode of

21

malignant intraoperative awareness, when, in fact, all he had experienced was an episode of benign transitional awareness[.]" The jury could reasonably find under this theory that Hay's misconduct was not a substantial factor in causing Randy's distress because the harm stemmed from Randy's own misconception of what occurred during surgery.

Additionally, as defendants argued in their opposition to the Dalos' motions, the jury could have reasonably concluded that Randy's post-surgery emotional distress was primarily caused by factors having little to do with Hay's misconduct. For example, the jury heard evidence that Randy had pre-existing depression stemming from his inability to work, myriad health problems, and medication side effects. James observed that Randy felt hopeless from being unable to return to fishing, felt shame from burdening his family, and experienced social isolation after going on disability. Although Dr. Baser's declaration stated that Randy had a single episode of mild MDD, she testified at trial that Randy actually has recurrent MDD because he was diagnosed with "continuing" depression in 2011. Dr. Baser also testified that Randy's chronic pain and medications, which he had been taking daily since around 2013, could cause depression. Dr. Stein then confirmed in her testimony that Randy's longstanding medical conditions, and the medications he was taking to treat them, could have been the causes of mood swings, anxiety, depression, and personality changes.

Lastly, although the Dalos claimed that Randy was harmed because he felt betrayed, lost trust in his medical providers, and was afraid to undergo additional procedures, the jury could reasonably conclude that such harm was either non-existent or the result of causes other than defendants' alleged dishonesty and concealment. Evidence showed that despite his asserted fears and feelings of betrayal, Randy still pressed for surgery in 2018, and then

22

underwent surgery at UCSD in 2021. Dr. Stein explained that psychological test results neither supported Randy's PTSD diagnosis nor showed he was especially fearful. There was evidence indicating that Randy might exaggerate his complaints or "manipulate others through his physical symptoms." Even Karen said Randy seemed to be paranoid after the surgery, and as noted, experts on both sides testified that Randy had pre-existing depression or anxiety which could have been caused by longstanding medical conditions or medications. A reasonable jury could therefore conclude from the evidence either that Randy did not suffer emotional distress from Hay's fraudulent concealment, or that the fraudulent concealment was not a substantial factor in causing his emotional distress.

In summary, the Dalos have not demonstrated that the evidence, when viewed in the light most favorable to defendants, is insufficient to support the jury's verdict. Nor have they shown that the court abused its discretion in denying their motion for new trial on sufficiency of evidence grounds. We therefore turn to their argument that a new trial is necessary because the jury's verdicts are inconsistent.

## II

The Dalos argue that the jury's findings that Randy suffered no harm from either Hay's battery or fraudulent concealment contradict its finding that there was harm from Hay's breach of fiduciary duty. Defendants contend that the Dalos have waived the issue and are barred from arguing it by the doctrine of invited error. Alternatively, defendants assert that the verdicts are consistent.

"On appeal, we review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*).) A jury's special verdict is inconsistent if

there is no possibility of reconciling its findings with each other. (*Id.* at p. 357.) "If a verdict is not 'hopelessly ambiguous,' the court may 'interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.'" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092, quoting *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456–457.) Irreconcilable verdicts are "against the law" and are grounds for a new trial. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682, quoting Code Civ. Proc., § 657, subd. (6).)

We need not decide whether the Dalos' argument was waived or barred because we conclude that the verdicts are not irreconcilable. We disagree with two premises of the Dalos' argument: that the factual basis for the jury's verdict on each of the causes of action was necessarily the same, and that the harm stemming from each of the claims was the same.

First, the factual basis for the jury's verdict on each of the causes of action was not necessarily the same. For the negligence claim, plaintiff's counsel argued multiple different acts of negligence against Hay, including treating Randy while under the influence of fentanyl, stealing drugs intended for the use of patients, and falsifying medical records. The trial court directed a verdict on negligence without telling the jury what specific act it found to be negligent, and the jury's verdict did not specify any particular act of negligence. For the battery and fraudulent concealment claims, the jury's verdict against Hay was based on the fact that Randy's consent to the anesthesia services was obtained by Hay's intentional concealment of material facts. For the breach of fiduciary claim, the court instructed the jury that it was based on Hay's conduct not only "in connection with the obtaining of consent" but also in "the making of medical records, and the

24

conduct of anesthesia." Again, the court directed a verdict on breach of fiduciary duty without telling the jury what specific act it was relying on, and the jury's verdict also did not specify any particular breach of fiduciary duty. On this record, therefore, we cannot assume that the factual basis for the jury's verdict was the same as to each cause of action.

Finally, without knowing more specifically what acts the jury treated as being negligent or a breach of fiduciary duty, we also cannot assume that any harm flowing from each of the individual claims was the same. For example, the jury may have found that the breach of fiduciary duty was based on some act other than those underlying its verdicts on the other causes of action. If so, the jury could have found that this act gave rise to some harm that was unrelated to the conduct underlying the negligence, battery, or intentional concealment claims. Notably, plaintiff's counsel argued to the jury that "[t]here are multiple harms that came from the defendants' conduct" and "[e]ach of the causes of action had their own particularized damage, some of which involved intraoperative awareness and some of which do not."

More specifically, the jury could have distinguished between several different types of harm argued by the Dalos at trial: (1) Randy's various theories of emotional harm upon discovering Hay's conduct, including depression, nightmares, PTSD, distress, and feelings of betrayal; and (2) the harm associated with the surgery itself, including the unconsented-to touching in the administration of anesthesia, the purported trauma of being awake during surgery, and Randy's pain upon waking up in the recovery room. The jury's verdict does not inform us what specific harm it found Randy to have suffered in connection with the breach of fiduciary claim or

25

whether that same harm necessarily would have flowed from the conduct underlying the jury's verdicts on the other claims.

With those distinctions in mind, for the reasons we have already discussed above, we conclude that the jury could simultaneously find that: (1) as to the battery, negligence, and fraudulent concealment causes of action, Randy suffered no physical or emotional harm from the act of receiving unconsented-to anesthesia during the surgery; and (2) as to the breach of fiduciary duty claim, Randy did suffer some emotional harm after the surgery upon learning of Hay's misconduct, but the misconduct was not a substantial factor in causing Randy's distress. There may be other reasonable paths to concluding the jury's verdicts are consistent, but so long as we can identify one, we need not order a new trial on the ground that the verdicts are irreconcilable. (*See Singh, supra*, 186 Cal.App.4th at p. 357.) Accordingly, the trial court committed no error in denying the motion for new trial on this ground.

## DISPOSITION

The judgment and the order denying the Dalos' motion for JNOV are affirmed. Defendants shall recover their costs on appeal.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

26